## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No. 08-CR-222 (EGS)** |
|  | : | **Violations:** |
|  | : | **18 U.S.C. § 2315 (Possession of Stolen** |
| **v.** | : | **Property)** |
|  | : | **18 U.S.C. § 1956(h) (Conspiracy to** |
|  | : | **Commit Money Laundering)** |
| **ALETHIA OLIVIA GROOMS,** | : | **18 U.S.C. §§ 371, 1010 (Conspiracy to** |
| **a/k/a "ALETHIA COVINGTON,"** | : | **Make False Statement in Connection with** |
| **a/k/a "ALETHIA MACK,"** | : | **FHA Loan)** |
| **a/k/a "ALETHIA SLOAN,"** | : | **18 U.S.C. § 2 (Aiding and Abetting)** |
|  | : | **18 U.S.C. § 982 (Criminal Forfeiture)** |
| **Defendant.** | : | |
|  | : | |

**FILED**

**AUG 1 3 2008**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## STATEMENT OF THE OFFENSES

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, defendant ALETHIA OLIVIA GROOMS (hereinafter "GROOMS") agrees and stipulates as follows:

## INTRODUCTION

At all times material to this Statement of the Offenses:

1.      GROOMS lived in Washington, D.C., and Clinton, Maryland.  GROOMS also used the names ALETHIA COVINGTON, ALETHIA MACK, and ALETHIA SLOAN.  GROOMS was a registered real estate agent.  In or about 2004, GROOMS founded a company called Awesome Graphic Designs.

2.      HARRIETTE WALTERS (hereinafter "WALTERS") lived in Washington, D.C. Beginning in or about 1981, WALTERS was employed by the District of Columbia government in the Department of Finance and Revenue, which later became the Office of Tax and Revenue

(hereinafter "OTR"). From in or about 2001 to in or about 2007, WALTERS was the manager of OTR's Real Property Tax Administration Adjustments Unit (hereinafter "RPTAAU"). As manager of RPTAAU, one of WALTERS's duties was to authorize or decline property tax refund requests.

3.    JAYRECE TURNBULL (hereinafter "TURNBULL") lived in Bowie, Maryland. TURNBULL was the niece of WALTERS. TURNBULL created several business entities, including First American Home, Chappa Interiors, and Legna Home Services. The primary purpose of these businesses was to further the scheme with WALTERS, as described below. In or about the winter/spring of 2002, TURNBULL used GROOMS as her real estate agent.

4.    CONNIE ALEXANDER (hereinafter "ALEXANDER") lived in Bowie, Maryland. ALEXANDER was a close friend of WALTERS. In or about the spring of 2007, ALEXANDER (and another individual) started a business called Aurora R.E. Enterprises, which was used in the scheme with WALTERS, as described below.

5.    RICARDO WALTERS (hereinafter "RICARDO") lived in Fort Washington, Maryland. RICARDO was the nephew of WALTERS. RICARDO owned a business called Provident Home Services, which was used in the scheme with WALTERS, as described below.

6.    Participant 1 lived in Suitland and District Heights, Maryland. For at least the past two decades, Participant 1 was employed in the Tax Sale Unit at OTR. The Tax Sale Unit administered an annual public auction to sell real property tax liens for which District of Columbia property taxes were unpaid during the previous tax year. Participant 1 had both a professional and a personal relationship with WALTERS. In or about the winter/spring of 2006, Participant 1 used GROOMS as her real estate agent.

7.      Participant 2 lived in District Heights and Capitol Heights, Maryland. Beginning in or about 1999, Participant 2 was employed at OTR. Participant 2 had both a professional and a personal relationship with WALTERS. In or about the summer of 2006, Participant 2 used GROOMS as her real estate agent.

8.      GROOMS met WALTERS in the 1980s at the University of the District of Columbia, where they were both students. They eventually became friends. Among other things, in the 1990s, GROOMS and WALTERS frequently gambled together at casino nights at volunteer fire departments in Prince George's County, Maryland.

9.      In or about 2000, GROOMS acted as WALTERS's real estate agent in the purchase of WALTERS's home on Oregon Avenue, N.W., Washington, D.C. In or about 2007, GROOMS referred a lender to WALTERS to assist WALTERS in refinancing her house.

10.      GROOMS was never entitled to a District of Columbia property tax refund.

## THE SCHEME

### Fraudulent District of Columbia Property Tax Refunds

#### GROOMS Joins the Scheme

11.      In or about 1989, WALTERS informed GROOMS that she was able to obtain fraudulent District of Columbia checks and inquired whether GROOMS knew anyone who could cash them. In addition to herself, GROOMS provided WALTERS with the names of two friends, Participant 3 and Participant 4.

12.      From in or about 1989 through in or about 1991, WALTERS used her position as a government employee to create false property tax refund vouchers for GROOMS, Participant 3, and Participant 4 and cause the issuance of fraudulent District of Columbia checks in their names. Both

the vouchers and the checks were marked "Hold for Pick Up" so that the checks would not be mailed. Instead, WALTERS had the fraudulent District of Columbia checks delivered personally to the co-conspirator payees, who then cashed the checks, sometimes using a specific teller at Riggs Bank.

13.     The following fraudulent District of Columbia checks were issued as part of this scheme:

| Date (On or About) | Check No. | Voucher No. | Payee | Amount |
|---|---|---|---|---|
| 6/29/89 | 099034 | VRRECARE 9579 | ALETHIA GROOMS | $4,060.00 |
| 8/3/89 | 019944 | VRRECARE 9670 | ALETHIA GROOMS | $4,848.66 |
| 8/16/89 | 030867 | VRRECARE 9719 | [Participant 4] | $4,525.33 |
| 8/16/89 | 030866 | VRRECARE 9715 | [Participant 4] | $9,678.63 |
| 10/5/89 | 074152 | VRRECARE 9845 | [Participant 4] | $4,914.68 |
| 12/13/89 | 116031 | VRRECARE 1003 | [Participant 3] | $3,707.27 |
| 1/12/90 | 131938 | VRRECARE 1119 | ALETHIA O. GROOMS | $4,628.40 |
| 6/13/90 | 264980 | VRRECARE 1653 | A.O. GROMES [sic] | $4,236.44 |
| 8/14/90 | 311542 | VRRECARE 1790 | [Participant 4] | $2,297.87 |
| 12/11/90 | 385241 | VRRECARE 2232 | [Relative of GROOMS] | $4,785.75 |
| 2/6/91 | 409003 | VRRECARE 2784 | OLIVIA GROOMS | $4,932.30 |
| 6/15/91 | 534431 | VRRECARE 3508 | [Participant 4] | $4,794.80 |
| 12/24/91 | 622854 | VRRECARE 4050 | ALETHIA MACK | $3,514.51 |
| 12/17/91 | 622855 | VRRECARE 4051 | A OLIVIA GROOMES [sic] | $4,602.75 |
| Total | | | | $65,527.39 |

GROOMS knew that neither she, her relative, Participant 3, nor Participant 4 was entitled to any of these checks from the District of Columbia government.

14.    Pursuant to their agreement, WALTERS, GROOMS, Participant 3, and Participant 4 split the proceeds of each fraudulent District of Columbia check among themselves. Occasionally, a portion of the proceeds went to a bank teller who was a participant in the scheme. In addition, GROOMS received some money from the fraudulent District of Columbia check for Participant 3.

## GROOMS Continues to Benefit from the Scheme

15.    Throughout the 1990s, and continuing until in or about 2007, WALTERS gave cash, checks, and other items of value to GROOMS. GROOMS was aware that WALTERS was a District of Columbia employee with a modest income from that job. GROOMS knew that the goods and services she received from WALTERS were the proceeds of fraud.

16.    For example, at various times during the conspiracy, and in addition to amounts provided in cash, WALTERS wrote personal checks to GROOMS from WALTERS's Bank of America account no. 5677[1] as follows:

| Date (On or About) | Check No. | Amount |
|---|---|---|
| 7/19/02 | 2449 | $1,300 |
| 8/29/02 | 2497 | $2,500 |
| 1/14/05 | 3393 | $1,000 |
| 2/11/05 | 3433 | $1,000 |
| 3/5/05 | 3455 | $5,000 |
| 9/9/05 | 3759 | $4,000 |
| 1/31/06 | 4048 | $3,500 |
| 11/8/06 | 4548 | $4,500 |
| 12/15/06 | 4804 | $500 |

---

[1]All but the last four digits of the account and case numbers listed in this Statement of the Offenses have been removed.

| 12/21/06 | 4826 | $1,500 |
|---|---|---|
| 1/16/07 | 4882 | $1,000 |
| 1/26/07 | 4909 | $4,000 |
| 1/29/07 | 4914 | $4,200 |
| 5/8/07 | 4692 | $8,300 |
| **Total** | | **$42,300** |

### GROOMS Continues to Cash District of Columbia Government Checks

17.    In or about the winter of 2006-2007, GROOMS and WALTERS had a conversation at a diner in which GROOMS agreed to cash additional fraudulent District of Columbia checks in GROOMS's name (or in the name of GROOMS's company) for WALTERS.

18.    On or about February 2, 2007, WALTERS created a fraudulent property tax refund voucher (VRRE 3537) for GROOMS in the amount of $84,101.80. The taxpayer name was listed as "Alethia Grooms C/O Jeff Nadel, Esq." The address of the payee was listed as "Hold for Pick Up." The materials attached to the voucher in purported support of the refund – checks from Quebec House Associates, LLC, Cafritz Company, Agent – had no relationship with GROOMS. Moreover, the voucher purported to provide a property tax refund at square 5635, lot 2225. There was no property in District of Columbia records associated with that square and lot information. The checks from Quebec House Associates contained different square and lot numbers than the numbers listed on the voucher.

19.    On or about February 13, 2007, the District of Columbia prepared a check to pay the property tax refund associated with VRRE 3537, Bank of America check no. 6694230, drawn on District of Columbia bank account no. 2547, in the amount of $84,101.80. That check was then delivered to GROOMS at her home in Clinton, Maryland. On or about February 16, 2007,

GROOMS signed the back of the check with her name, "Alethia Grooms," and deposited the proceeds into multiple bank accounts held by GROOMS at SunTrust bank:  approximately $52,000 was deposited into account no. 4871; approximately $10,000 was deposited into account no. 4889; and the balance, approximately $22,000, was deposited into account no. 7628.   Ultimately, GROOMS kept $25,000 from that fraudulent District of Columbia check and gave the rest of the money to WALTERS in the form of cash and cashier's checks.

20.    On or about May 17, 2007, WALTERS created another fraudulent property tax refund voucher (VRRE 3782) for GROOMS in the amount of $125,000.  This time, the taxpayer name was listed as "Awsomgraphics Group Attn: A. Grooms/Carfritz Realty."  The address of the payee was listed as "Hold for Pick Up."  The material attached to the voucher in purported support of the refund – a check from Demers Real Estate – had no relationship with GROOMS or her business, Awesome Graphic Designs.  Moreover, there was no property in the District of Columbia associated with the square and lot numbers listed on the voucher.

21.    On or about June 5, 2007, the District of Columbia prepared a check to pay the property tax refund associated with VRRE 3782, Bank of America check no. 6764650, drawn on District of Columbia bank account no. 2547, in the amount of $125,000.00.  That check was delivered to GROOMS at her home in Clinton, Maryland.  On or about June 6, 2007, GROOMS opened bank account no. 3639 at Manufacturers and Traders Trust Company (hereinafter "M&T Bank") in the name of Alethia O. Grooms, DBA Awesome Graphic Designs.  On or about June 8, 2007, GROOMS signed the back of Bank of America check no. 6764650 with her name and the name of her company, "Awesome Graphics A. Grooms," and deposited the check into her bank account at M&T Bank in Clinton, Maryland.  Like the previous fraudulent District of Columbia

check in February 2007, GROOMS kept $25,000 for herself and gave the balance of the proceeds to WALTERS in the form of cash and cashier's checks. In particular, on or about June 19, 2007, GROOMS purchased M&T Bank cashier's check no. 450131670-0, payable to "American Express Harriette M Walters," in the amount of $25,000. On or about June 28, 2007, GROOMS purchased M&T Bank cashier's check no. 450131684-4, payable to "Harriette M Walters," in the amount of $25,000. Also at WALTERS's instruction, on or about June 19, 2007, using the funds from Bank of America check no. 6764650, GROOMS purchased M&T Bank cashier's check no. 450131671-8, payable to an employee at OTR, in the amount of $25,000. WALTERS directed GROOMS to put "services rendered" on that cashier's check, even though the OTR employee in question had not performed any services for GROOMS.

22.     On or about July 24, 2007, WALTERS created another fraudulent property tax refund voucher (VRRE 3841) for GROOMS in the amount of $189,000. The taxpayer name was listed as "Awsomegraphics, Enterprises C/O Geff Nadel, Esq." The payee address was listed as "Hold for Picj [sic] Up." The materials attached to the voucher in purported support of the refund – a District of Columbia Property Tax Electronic Fund Transfer Worksheet for Industrial Bank, N.A., and a check from GMAC Mortgage – had no relationship with GROOMS or her business, Awesome Graphic Designs. Moreover, there was no property in the District of Columbia associated with the square and lot numbers listed on the voucher. Finally, attorney Nadel had no relationship with GROOMS or Awesome Graphic Designs.

23.     On or about August 9, 2007, the District of Columbia prepared a check to pay the property tax refund associated with VRRE 3841, Bank of America check no. 6805520, drawn on District of Columbia bank account no. 2547, in the amount of $189,000.00. On the check itself, the

payee name had been slightly changed to "Jeff Nadel" (instead of "Geff Nadel") and the mis-spelled phrase "Hold for Picj Up" had been corrected to read "Hold for Pick-Up." GROOMS picked up that check outside of WALTERS's office building in the District of Columbia. On or about August 16, 2007, GROOMS signed the back of Bank of America check no. 6805520 with her name and the name of her business, "Awesome Graphics Alethia Grooms," and deposited the check into her company's account at M&T Bank. On or about August 28, 2007, GROOMS purchased two M&T Bank cashier's checks: M&T Bank cashier's check no. 450131778-0, payable to an individual with whom WALTERS had a close relationship, in the amount of $25,000; and M&T Bank cashier's check no. 450131779-8, payable to "Harriette M Walters," in the amount of $25,000.

24.    In sum, from in or about February 2007 through in or about August 2007, GROOMS and WALTERS collaborated to create the following false property tax refund vouchers and cause the issuance of the following fraudulent District of Columbia checks:

| Date (On or About) | Check No. | Voucher No. | Payee | Amount |
|---|---|---|---|---|
| 2/13/07 | 6694230 | VRRE 3537 | ALETHIA GROOMS C/O JEFF NADEL, ESQ HOLD FOR PICK UP | $84,101.80 |
| 6/5/07 | 6764650 | VRRE 3782 | AWSOMGRAPHICS GROUP ATTN: A. GROOMS/CARFRITZ REALTY HOLD FOR PICK UP | $125,000.00 |
| 8/9/07 | 6805520 | VRRE 3841 | AWSOMEGRAPHICS, ENTERPRISES C/O GEFF NADEL, ESQ HOLD FOR PIC[K] UP | $189,000.00 |
| Total | | | | $398,101.80 |

GROOMS knew that neither she nor her company, Awesome Graphic Designs, was entitled to any of these checks from the District of Columbia government.

### GROOMS Helps Cover Up the Scheme

25.     On or about April 5, 2007, WALTERS created a fraudulent property tax refund voucher (VRRE 3701) for TURNBULL in the amount of $410,000. The taxpayer name was listed as "First American Home C/O David Fuss, Esq." The payee address was listed as "Hold for Pick Up." The materials attached to the voucher in purported support of the refund – checks from four different entities – had no relationship with TURNBULL or her business, First American Home. Although the square and lot numbers listed on the refund research form attached to the voucher corresponded to an actual property in Washington, D.C., that property owner had no known association with TURNBULL or First American Home. Moreover, attorney Fuss (hereinafter "Fuss") had no relationship to TURNBULL or First American Home.

26.     On or about May 23, 2007, the District of Columbia prepared a check to pay the property tax refund associated with VRRE 3701, Bank of America check no. 6756040, drawn on District of Columbia bank account no. 2547, in the amount of $410,000. On or about June 18, 2007, TURNBULL deposited that check into an account under her control at SunTrust bank, account no. 8316, at the Bowie Town Center Branch in Bowie, Maryland.

27.     On or about June 25, 2007, TURNBULL wrote a check from her SunTrust bank account no. 8316 in the amount of $200,000 and attempted to deposit it into Bank of America account no. 2467, another bank account under TURNBULL's control. On or about June 27, 2007, a SunTrust employee spoke with Fuss (the "care of" addressee on District of Columbia check no. 6756040) and determined that Fuss was a real estate attorney who was engaged, in part, in obtaining

refunds of property tax overpayments for clients in Washington, D.C. Fuss stated that neither "First American Home" nor TURNBULL was one of his clients. On or about July 9, 2007, a SunTrust employee met personally with TURNBULL and advised her that SunTrust needed information about her business to verify her claim to the funds from the property tax refund in check no. 6756040. TURNBULL was asked to provide copies of business tax returns, a business license, and any bank references. On or about July 10, 2007, SunTrust asked TURNBULL to provide documentation, such as articles of incorporation, to prove that she was an authorized agent of First American Home.

28.    On or about July 11, 2007, at the Assessor's Office for the Government of Prince George's County, Maryland, TURNBULL filed a trade name application for First American Home, wherein TURNBULL listed herself as the owner of the business. A separate form titled, "Application for Identification Number," and signed by TURNBULL stated that First American Home was started in April 2007. On or about July 12, 2007, TURNBULL forwarded copies of the Trade Name Application and Application for Identification Number to SunTrust. SunTrust personnel observed the suspicious timing of the filing of these documents. On or about September 17, 2007, TURNBULL hand delivered a letter written on Government of the District of Columbia letterhead to a SunTrust bank branch in Laurel, Maryland. The letter was addressed to First American Home and purported to confirm that First American Home participated in OTR's annual real property tax sale and that TURNBULL was a registered representative of First American Home. At the end of the letter, the signature "[C.H.], Real [P]roperty Tax Sale manager" had been forged.

29.    GROOMS attempted to aid TURNBULL and WALTERS in their efforts to alleviate SunTrust's concerns about the fraudulent $410,000 District of Columbia check. In or about September 2007, WALTERS contacted GROOMS and stated that TURNBULL had attempted to

cash a check at a bank but was unsuccessful because TURNBULL had not prepared the proper paperwork. During this call, WALTERS was crying and seemed upset. WALTERS mentioned a $410,000 check and remarked that she needed to show something to the bank. GROOMS knew that the check in question was fraudulent. WALTERS later faxed GROOMS a District of Columbia Government Real Property Tax Sale form with writing on it and asked GROOMS to remove the writing. WALTERS knew that GROOMS did graphics design work. WALTERS explained that she needed a blank form for TURNBULL. GROOMS scanned the form onto a computer and deleted the writing from the scanned document as requested by WALTERS. GROOMS delivered the blank form to TURNBULL at TURNBULL's home in Bowie, Maryland, for TURNBULL to use in connection with the $410,000 check deposit at SunTrust.

### GROOMS Accepts a $145,000 Check from WALTERS

30.    On or about July 12, 2007, GROOMS deposited Bank of America cashier's check no. 278162, in the amount of $145,000, into her Bank of America account no. 8369. That check was made payable to "[J.M.P.] Attorn[e]y Trust Account" and listed WALTERS and GROOMS as the remitters. J.M.P. was an attorney working on a real estate transaction in New Jersey in which WALTERS was involved. Both WALTERS and GROOMS signed the back of the check along with the handwritten words, "not used for purpose intended."

31.    GROOMS knew that check no. 278162 was the proceeds of fraud. In fact, the funds for that check came from WALTERS's scheme to steal money from the District of Columbia government. On or about June 25, 2007, WALTERS purchased a $300,000 Bank of America cashier's check, no. 2739243, payable to "[J.P.] Att[o]rn[e]y Trust Acc." WALTERS used RICARDO's Bank of America account no. 0064, in the name of RICARDO and Provident Home

Services, as the source of the funds for that check. Before on or about June 25, 2007, at least ten fraudulent District of Columbia checks, for a total of over $4.2 million, had been deposited into RICARDO's Provident Home Services bank account, one as recently as on or about June 18, 2007, in the amount of $399,498. On or about July 6, 2007, WALTERS used check no. 2739243 to purchase another cashier's check, no. 278122, in the same amount, $300,000. This time, the cashier's check was made payable to "Aurora Enterprises," a business owned by ALEXANDER. On or about July 11, 2007, WALTERS cashed check no. 278122 and purchased Bank of America cashier's check no. 278158 in the amount of $145,000. Later on or about that same date, WALTERS used check no. 278158 to purchase Bank of America cashier's check no. 278162 (which, as discussed above, was deposited into GROOMS's Bank of America account).

32.    Following its deposit into her bank account, GROOMS aided WALTERS in disguising and concealing the provenance of the $145,000. On or about July 12, 2007, GROOMS withdrew $145,000 from account no. 8369 and purchased Bank of America cashier's check no. 278195 in the amount of $145,000. Check no. 278195 was made payable to "[J.M.P.] Attorney Trust Account" and listed WALTERS and GROOMS as the remitters. GROOMS then used check no. 278195 to purchase Bank of America cashier's check no. 278196. Check no. 278196 was essentially identical to its predecessor, except that (1) GROOMS was the only remitter listed on check no. 278196, and (2) there was handwriting in the payee section of check no. 278196 that stated, "For Harriette M. Walters." WALTERS signed the back of check no. 278196 along with the handwritten words, "not used for purpose intended." The proceeds of that check were then distributed to several individuals, including WALTERS and Participant 2.

33.    In sum, the $145,000 deposit into GROOMS's Bank of America account no. 8369 took the following path:

| Source | Check No. | Amount | Date (On or About) | Remitter | Payee | Comments |
|---|---|---|---|---|---|---|
| RICARDO's account no. 0064 | 2739243 | $300,000 | 6/25/07 | WALTERS | J.P. | |
| 2739243 | 278122 | $300,000 | 7/6/07 | WALTERS | Aurora Enterprises | |
| 278122 | 278158 | $145,000 | 7/11/07 | WALTERS | J.M.P. | |
| 278158 | 278162 | $145,000 | 7/11/07 | WALTERS/ GROOMS | J.M.P. | Check no. 278162 was deposited into GROOMS's account no. 8369 |
| GROOMS's account no. 8369 | 278195 | $145,000 | 7/12/07 | WALTERS/ GROOMS | J.M.P. | |
| 278195 | 278196 | $145,000 | 7/12/07 | GROOMS | J.M.P. for WALTERS | Check no. 278196 was cashed for $106,000 and used to buy four cashier's checks |

**Mortgage Fraud**

Participant 1's HUD/FHA Loan

34.    In or about the winter/spring of 2006, GROOMS was the real estate agent for Participant 1's purchase of a house in District Heights, Maryland.  WALTERS referred Participant 1 to GROOMS.

35.     The sales price of Participant 1's house was $335,000. Participant 1 applied for and obtained a HUD/Federal Housing Administration (hereinafter "FHA") loan in the amount of $332,373 from 1st Chesapeake Home Mortgage, LLC, of Annapolis, Maryland (hereinafter "1st Chesapeake"). The note rate was 5.5% for a term of 360 months. The HUD/FHA case no. was 6664.

36.     The settlement occurred on or about March 13, 2006, in Maryland. Participant 1 submitted a Uniform Residential Loan Application and a HUD/VA Addendum to Uniform Residential Loan Application, both dated March 13, 2006, to 1st Chesapeake. Participant 1 initialed or signed each page of the loan application and signed the addendum. In particular, Participant 1 signed the Acknowledgement and Agreement section of the loan application, which stated in relevant part:

> Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq. * * * (7) the Lender and its agents, brokers, insurers, servicers, successors and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to the closing of the Loan[.]

Participant 1 also signed the Borrower Certification section of the addendum, which stated in relevant part:

> (5) All information in this application is given for the purpose of obtaining a loan to be insured under the National Housing Act or guaranteed by the Department of Veterans Affairs and the information in the Uniform Residential Loan Application

-15-

and this Addendum is true and complete to the best of my knowledge and belief. Verification may be obtained from any source named herein.

Next to Participant 1's signature on the addendum were the following notifications:

Do not sign[ ]unless this application is fully completed. Read the certifications carefully & review accuracy of this application. * * * Federal statutes provide severe penalties for any fraud, intentional misrepresentation, or criminal connivance or conspiracy purposed to influence the issuance of any guaranty or insurance by the VA Secretary or the HUD/FHA Commissioner.

Furthermore, as part of the settlement, on or about March 13, 2006, Participant 1 signed a form titled, "Important Notice to Homebuyers," from HUD. That form expressly stated:

Don't Commit Loan Fraud * * * Do not falsify information about your income or assets. * * * Do not provide false letters-of-credit, cash-on-hand statements, gift letters or sweat equity letters. * * * Do not accept funds to be used for your down payment from any other party (seller, real estate salesperson, builder, etc.).

37.     On page two of her loan application, Participant 1 listed "Riteway Medical" of Washington, D.C., as one of her employers. Participant 1 represented that she was an accountant with Riteway Medical and that she worked there from October 2002 to present. To support her claim of supplemental employment, Participant 1 provided her lender with four documents in Participant 1's name purporting to be from Riteway Medical:

| Document | Purported Date (In or About) | Purported Amount |
|----------|------------------------------|------------------|
| Pay Stub | January 29, 2006, to February 11, 2006 | $1,348.03 in current salary |
| Pay Stub | January 15, 2006, to January 28, 2006 | $1,348.03 in current salary |
| W-2 | 2005 | $35,048.76 in wages, tips, or other compensation |
| W-2 | 2004 | $32,956.44 in wages, tips, or other compensation |

-16-

38.     In fact, Participant 1 never worked at, nor received a salary from, Riteway Medical. The four documents referenced in the preceding Paragraph were forged by GROOMS as part of the conspiracy to obtain a HUD/FHA loan for Participant 1 by fraudulent means. Using her graphics design and computer skills, GROOMS created fake pay stubs and W-2 forms for Participant 1 so that Participant 1 could report a second income on her loan application. GROOMS believed that this would increase Participant 1's chances of qualifying for and obtaining a HUD/FHA loan.

39.     GROOMS also conspired with Participant 1 to inflate the balance of Participant 1's credit union share account. On page three of her loan application, Participant 1 represented that she had an account with the "Dist. Fov. [sic] Empl. FCU" that had a cash or market value of $25,244. Participant 1 provided two documents purporting to be statements from the District Government Employees Federal Credit Union (hereinafter "DGEFCU") for her share account no. 5380. One purported statement covered the period of December 1, 2005, through December 31, 2005, and the other covered the period of January 1, 2006, through January 31, 2006. The December 2005 statement showed an ending balance of $23,204.19. The January 2006 statement showed an ending balance of $25,244.89.

40.     Although Participant 1 did hold a share account at the DGEFCU, the actual balance of account no. 5380 was $20,000 less than what Participant 1 claimed in her loan application. Her actual ending balance on January 31, 2006, was $5,244.89. To perpetuate this fraudulent act, Participant 1 gave GROOMS copies of her real DGEFCU statements for December 2005 and January 2006. Using a scanner and a computer, GROOMS edited those credit union statements to overvalue Participant 1's account by exactly $20,000. Participant 1 included a copy of the forged account statements in her loan application.

41.    As part of her loan application materials, Participant 1 also submitted a signed gift letter to 1st Chesapeake to explain a $5,000 deposit into her DGEFCU account on or about January 3, 2006. On or about that date, WALTERS wrote Participant 1 a $5,000 personal check, no. 3984, from WALTERS's Bank of America account no. 5677. As submitted to 1st Chesapeake, the gift letter stated that the money was a "gift" and that WALTERS's relationship to Participant 1 was "aunt." The gift letter stated at the bottom:

> WARNING: Our signatures above indicate that we fully understand that it is a Federal Crime punishable by fine, imprisonment, or both to knowingly make any false statement concerning any of the above facts as applicable under the provision of Title 18, United States Code, Section 1012 and 1014.

42.    In fact, WALTERS was not Participant 1's aunt, a fact of which WALTERS, Participant 1, and GROOMS were all aware. GROOMS believed that the gift letter had to show that the $5,000 "gift" came from a relative – as opposed to a co-worker or a friend – for Participant 1 to qualify for and obtain her HUD/FHA loan.

### Participant 2's HUD/FHA Loan

43.    In or about the summer of 2006, GROOMS was the real estate agent for Participant 2's purchase of a house in Capitol Heights, Maryland. At one point during the process, Participant 2 told GROOMS that Participant 2 wanted her monthly payments to be between $2,000 and $2,500.

44.    The sales price of Participant 2's house was $270,000. Participant 2 applied for and obtained a HUD/FHA loan in the amount of $265,828 from 1st Chesapeake. The note rate was 6.375% for a term of 360 months. The HUD/FHA case no. was 9514.

45.    The settlement occurred on or about August 4, 2006, in Maryland. The settlement company for Participant 2's real estate transaction was Northstar Settlements, LLC. On or about August 4, 2006, Participant 2 tendered Bank of America cashier's check no. 214503, dated that same

day, in the amount of $18,000 to Northstar Settlements, LLC. That check only listed Participant 2 as the remitter. In fact, the source of the cashier's check was an $18,000 personal check from WALTERS, check no. 4391 from WALTERS's Bank of America account no. 5677, dated August 4, 2006, payable to Participant 2's relative. Check no. 4391 was cashed at 9:50 a.m. on or about August 4, 2006, and cashier's check no. 214503 was purchased at 9:52 a.m. on or about the same date, using the same bank teller at Bank of America.

46.    Also, on or about August 4, 2006, Participant 2 submitted a Uniform Residential Loan Application and a HUD/VA Addendum to Uniform Residential Loan Application, both dated August 4, 2006, to 1st Chesapeake. Participant 2 initialed or signed each page of the loan application and signed the addendum. In particular, Participant 2 signed the Acknowledgement and Agreement section of the loan application, which stated in relevant part:

> Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq. * * * (7) the Lender and its agents, brokers, insurers, servicers, successors and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to the closing of the Loan[.]

Participant 2 also signed the Borrower Certification section of the addendum, which stated in relevant part:

> (5) All information in this application is given for the purpose of obtaining a loan to be insured under the National Housing Act or guaranteed by the Department of Veterans Affairs and the information in the Uniform Residential Loan Application

-19-

and this Addendum is true and complete to the best of my knowledge and belief. Verification may be obtained from any source named herein.

Next to Participant 2's signature on the addendum were the following notifications:

Do not sign[ ]unless this application is fully completed. Read the certifications carefully & review accuracy of this application. * * * Federal statutes provide severe penalties for any fraud, intentional misrepresentation, or criminal connivance or conspiracy purposed to influence the issuance of any guaranty or insurance by the VA Secretary or the HUD/FHA Commissioner.

Furthermore, as part of the settlement, on or about August 4, 2006, Participant 2 signed a form titled, "Important Notice to Homebuyers," from HUD. That form expressly stated:

Don't Commit Loan Fraud * * * Do not falsify information about your income or assets. * * * Do not provide false letters-of-credit, cash-on-hand statements, gift letters or sweat equity letters. * * * Do not accept funds to be used for your down payment from any other party (seller, real estate salesperson, builder, etc.).

47.     On page two of her loan application, Participant 2 listed "Carpet Discounter" of Suitland, Maryland, as one of her employers. Participant 2 represented that she was a bookkeeper with Carpet Discounter and that she worked there from August 1, 2003, to present. To support her claim of supplemental employment, Participant 2 provided her lender with four documents in Participant 2's name purporting to be from Carpet Discounter:

| Document | Purported Date (In or About) | Purported Amount |
|----------|------------------------------|-------------------|
| Pay Stub | June 25, 2006, to July 8, 2006 | $982.64 in current salary |
| Pay Stub | June 4, 2006, to June 24, 2006 | $982.64 in current salary |
| W-2 | 2005 | $23,944.62 in wages, tips, or other compensation |
| W-2 | 2004 | $21,650.38 in wages, tips, or other compensation |

48.     In fact, Participant 2 never worked at, nor received a salary from, Carpet Discounter. The four documents referenced in the preceding Paragraph were forged by GROOMS as part of the

-20-

conspiracy to obtain a HUD/FHA loan for Participant 2 by fraudulent means. GROOMS had been instructed by WALTERS to do whatever it took to ensure Participant 2 would be able to buy a house. Using her graphics design and computer skills, GROOMS created fake pay stubs and W-2 forms for Participant 2 so that Participant 2 could report a second income on her loan application. GROOMS believed that this would increase Participant 2's chances of qualifying for and obtaining a HUD/FHA loan.

49.     GROOMS also conspired with Participant 2 to inflate the balance of Participant 2's credit union share account. On page three of her loan application, Participant 2 represented that she had an account with the "District Government" that had a cash or market value of $22,148. Participant 2 provided a document purporting to be a statement from the DGEFCU for her share account no. 8401 for the period of June 1, 2006, through June 30, 2006. That account statement showed an ending balance of $22,148.81.

50.     Although Participant 2 did hold a share account at the DGEFCU, the actual balance of account no. 8401 on June 30, 2006, was $2,108.81, approximately $20,000 less than what Participant 2 claimed in her loan application. To perpetuate this fraudulent act, Participant 2 gave GROOMS a copy of her real DGEFCU statement for June 2006. Using a scanner and a computer, GROOMS edited that credit union statement to overvalue Participant 2's account by approximately $20,000. GROOMS even increased a 1.01% dividend credit on the June 2006 statement from $1.75 to $21.75 to keep it in proportion with the fake inflated balance. Participant 2 included a copy of the forged account statement in her loan application.

51.     GROOMS created the fraudulent DGEFCU statement to help Participant 2 hide the source of $18,000 from WALTERS by making it appear that those funds originated from Participant 2's credit union share account.  In fact, through one of Participant 2's relatives, WALTERS had secretly contributed that money to Participant 2's home purchase.  Handwritten notes by the underwriter on the HUD Mortgage Credit Analysis Worksheet stated, "All funds for down payment [and] closing are her own," indicating that this fraudulent conduct was material to the approval of Participant 2's loan application.

## TURNBULL's Mortgage

52.     In or about the winter/spring of 2002, GROOMS was the real estate agent for TURNBULL's purchase of a house in Bowie, Maryland.  The sales price of TURNBULL's house was $327,000. TURNBULL applied for and obtained a conventional loan in the amount of $310,650 from Pacific Guarantee Mortgage.  This loan was not guaranteed by HUD/FHA.

53.     The settlement occurred on or about March 29, 2002, in Maryland.  TURNBULL submitted a Uniform Residential Loan Application, which TURNBULL signed and dated on or about March 29, 2002, to Pacific Guarantee Mortgage.  Above her signature on page three of the loan application was the following certification:

> I/We certify that the information provided in this application is true and correct as of the date set forth opposite my/our signature(s) on this application and acknowledge my/our understanding that any intentional or negligent misrepresentation(s) of the information contained in this application may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001 et seq. and liability for monetary damages to the Lender, its agents, successors and assigns, insurers and any other person who may suffer any loss due to reliance upon any misrepresentation which I/we have made on this application.

TURNBULL also signed a separate document containing a section titled, "Borrower's Certification & Authorization Certification," which stated:

> 1. I/We have applied for a mortgage loan from Pacific Guarantee Mortgage (lender). In applying for the loan, I/We completed a loan application containing various information on the purpose of the loan, the amount and source of the down payment, employment and income information, assets and liabilities. I/We certify that all of the information is true and complete. I/We made no misrepresentations in the loan application or documents, nor did I/We omit any pertinent information. * * * 3. I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements when applying for this mortgage, as applicable under the provisions of Title 18, United States Code, Section 1014.

54.    As with the HUD/FHA loans that GROOMS helped Participant 1 and Participant 2 obtain through fraudulent means, GROOMS aided TURNBULL in fraudulently misrepresenting TURNBULL's employment in TURNBULL's mortgage documents.  On the first page of TURNBULL's loan application, TURNBULL listed her employer as "Kind Hearts Inc." of Washington, D.C.  TURNBULL represented that she had been employed for 7.5 years and was a counselor.  TURNBULL also represented that her gross monthly income was $10,314.41. Significantly, TURNBULL did not list in her loan application any income from the three businesses that she had created.  To support her claim of employment at Kind Hearts Inc., TURNBULL provided her lender with two pay stubs and two W-2 forms in TURNBULL's name purporting to be from that company.

55.    In fact, TURNBULL never worked at, nor received a salary from, Kind Hearts Inc. The pay stubs and W-2 forms in question were fraudulent.  These documents had been forged by GROOMS using GROOMS's graphics design and computer skills. GROOMS wanted to ensure that TURNBULL obtained a loan for the house, so that GROOMS would earn a commission on the deal.

## DEFENDANT'S ACCEPTANCE

I have read every word of this 24-page Statement of the Offenses. Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, and after consulting with my attorney, I agree and stipulate to this Statement of the Offenses.


Date: _7/30/08_                          _Alethia Grooms_
                                         Alethia Olivia Grooms
                                         Defendant


I have discussed this Statement of the Offenses with my client, Alethia Olivia Grooms. I concur with her decision to stipulate to this Statement of the Offenses.


Date: _7.30.08_                          _____
                                         Kevin McCants, Esq.
                                         Counsel for Defendant Grooms


-24-